1   JOSEPH F. WALSH
    Attorney at Law
2   California Bar No. 67930
    205 S. Broadway, Suite 606
3   Los Angeles, CA 90012
    Tel: (213)627-1793
4   Fax: (213)627-1711
    Email: Attyjoewalsh@aol.com
5
    Attorney for Defendant
6   JESSICA MEDINA
    Deft. No. 27
7

8                   UNITED STATES DISTRICT COURT

9                CENTRAL DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,    )   Case No. CR-10-351-ODW-27
                                 )
12          Plaintiff,           )   **NOTICE OF MOTION AND MOTION**
                                 )   **TO SUPPRESS WIRETAP**
13          v.                   )   **EVIDENCE; DECLARATION OF**
                                 )   **JESSICA MEDINA; MEMORANDUM**
14  JESSICA MEDINA,              )   **OF POINTS AND AUTHORITIES**
                                 )
15          Defendant.           )   Date: August 13, 2012
                                 )   Time: 10:00 a.m.
16                               )   Ctrm: Hon. Otis D. Wright II
                                 )
17  ─────────────────────────────)

18

19

20  TO THE UNITED STATES ATTORNEY:

21          PLEASE TAKE NOTICE that on August 13, 2012, or as soon

22  thereafter as counsel  may be heard, the defendant JESSICA MEDINA

23  will move this Court for an order suppressing all evidence seized

24  as a result of unlawful electronic surveillance, and all derivative

25  evidence obtained as a result of those unlawful seizures.

26  Alternatively, the defendant requests a hearing pursuant to <u>Franks</u>

27  <u>v. Delaware</u>, 483 U.S. 154 (1978).

28          This motion is based on the attached memorandum of points

    and authorities, declaration, exhibits, any and all files and

1  records in this case, and such additional evidence and argument as

2  may be presented to the Court at or before a hearing on this

3  matter.

4

5  Dated: July 13, 2012                    /s/ Joseph F. Walsh

6                                          JOSEPH F. WALSH
                                           Attorney for Defendant
7                                          JESSICA MEDINA
                                           Deft. No. 27
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF THE FACTS

Introduction

This is a motion to suppress wiretap evidence filed by defendant Jessica Medina ("Medina").  The indictment in this case charges multiple defendants who are purported members of the "Black Angels" gang based primarily in Ontario, California.  During the course of the Drug Enforcement Administration's investigation, the government obtained authorization to wiretap several phones, including Target Telephone #9 ("TT #9"), subscribed to Jessica Medina, with a telephone number of (909) 419-9937, and used primarily by Carlos Rivera ("Rivera").  The defendant moves to suppress all of the intercepted telephone calls over TT #9 and all evidence derived from information obtained from the calls.

The defendant has standing to move to suppress wiretap evidence obtained through the wiretap of Target Telephone #9 because she was a party to the intercepted telephone call conversations.  18 U.S.C. §2510.  Because the wiretapped telephone call conversations led police to other evidence, the defendant has standing to move to suppress any evidence that is derivative evidence of the wiretap.  18 U.S.C. §2518 (10).

Goals of the Investigation

The wiretap application for TT #9 was filed on July 17, 2009 and was based upon the affidavit of Ontario Police Officer Kris Lavoie.  In applying for the wiretap, the affiant stated that

1  the goals of the investigation were to discover the identities of

2  narcotic distributors, stash locations, the profits derived from

3  drug trafficking, and the nature, extend, methods of operation.  It

4  was also the gaol of the investigation to identify the co-

5  conspirators and their various roles, the locations used to

6  distribute narcotics, the sources of supply fo the narcotics, and

7  the involvement of the members of the Ontario Black Angeles gang.

8  (Affidavit, pgs.62-63.)

9

10  Probable Cause for the July 17, 2009 Wiretap

11       On July 17, 2009, the Drug Enforcement Administration

12  applied for and received permission to wiretap, among others, a

13  telephone line registered to Jessica Medina and used by Carlos

14  Rivera ("Rivera").[1] (App. p.9, Bates 522)

15       Through wiretaps already in place on suspected Black

16  Angels gang member David Navarro ("Navarro"), police intercepted

17  several calls between Navarro and Rivera. During one of these

18  intercepted calls on May 16, 2009, a discussion between Navarro and

19  Rivera discussed the fact that an individual named Rafita owed

20  Rivera money, and that an agreement was made between Rivera and

21  Rafita in which Rafita would be paying Rivera "little by little."

22  (App. p.53, Bates 593) TFO Kris Lavoie, who prepared the

23  application, stated that he believed that the intercepted

24  conversation was discussing a possible extortion payment from

25

26       [1] A copy of the wiretap application and order is lodged with
27  this motion as Exhibit A. All references to the wiretap
   application and order will be referenced by "App" and is also
28  referenced by the Bates stamp number.

4

1  Rafita to Navarro and Rivera. (App. p.54, Bates 594)

2  　　　　In another phone call on May 26, 2009, Navarro asked if
3  Rivera wanted "some grain" and asked if he could receive "a gram"
4  from Rivera. As a result of this conversation, law enforcement
5  established surveillance on Navarro and located him in a multi-unit
6  apartment complex. (App. p.55, Bates 595)  TFO Kris Lavoie stated
7  that he believed the intercepted conversation was discussing a
8  possible sale of narcotics between Navarro and Rivera. (App. p.55,
9  Bates 595)

10  　　　　In a conversation that was recorded on June 26, 2009, in
11  which Rivera informed Navarro that he had an unidentified object
12  "at hand" that was "brand new" and "little". (App. p.55, Bates 595)
13  Navarro asked if it was "a 2" to which Rivera responded it was a
14  "2.5". (App. p.56, Bates 596)   Rivera and Navarro agreed to
15  purchase the unidentified object and "talk the third party down"
16  from the original asking price. (App. p.55, Bates 595) TFO Kris
17  Lavoie stated that he believed this was discussing the purchase of
18  a .25 caliber firearm. (App. p.56, Bates 596)

19  　　　　Finally, on July 8, 2009, Rivera asked Navarro whether he
20  knew a "guy named Flaco" and that Flaco "wanted to scare a girl
21  there at Nocta". Rivera said that Flaco came over to the girl
22  ("Liz") and told her that he had better prices and he scared her."
23  (App. p.58, Bates 598)  TFO Kris Lavoie stated that he believed
24  Rivera and Navarro were discussing the protection of a victim of
25  extortion named Liz from an intervening third party identified as
26  Flaco. (App. p.60, Bates 600)

27

28  <u>Necessity for the July 17, 2009 Wiretap</u>

1    In the Wiretap Application dated July 17, 2009, the
2  affiant states that physical surveillance of was established on
3  Carlos Rivera when Rivera met with codefendant Navarro on July 3,
4  2009. During the day long surveillance, law enforcement officials
5  were able to observe both Navarro and Rivera's interactions with
6  several as of yet unidentified individuals and follow them to
7  various locations. (App. pgs.68-71, Bates 608-611)   Upon
8  identifying Rivera, they also discovered that Rivera was a parolee
9  and subject to parole searches of his home. (App. p.71, Bates 611)

10    In the target subjects portion of the government's
11  affidavit in support of wiretap authorization, the affiant
12  identifies Rivera's address and place of residence as 815 North
13  Vineyard Ave., Apartment B; the same address where he was later
14  arrested on August 6, 2009. (App. p.23, Bates 563)  Although it is
15  unknown where law enforcement officials received this information,
16  it is probable that it was the address listed in Rivera's parolee
17  information sheets as required by law.

18    However, in an attempt to strengthen the government's
19  showing of the necessity of the wiretap, the affiant either
20  recklessly ignored or intentionally misled the reviewing magistrate
21  of the fact that law enforcement officials knew where Rivera lived.
22  The affiant stated in the "Trash Search" section of the discussion
23  of the necessity for the wiretap stated that: "I am not able to
24  complete trash searches on the users of Target Telephone #7, Target
25  Telephone #8, or Target Telephone #9, as law enforcement does not
26  have known residences for these individuals identified as of this
27  date." (App. p.82, Bates 622)   This was clearly false, because
28  elsewhere in the affidavit it was alleged that Target Telephone #9

was primarily used by Carlos Rivera (App. p.9, Bates 522) and Rivera's address and listed his place of residence as 815 North Vineyard Ave., Apartment B. (App. p.23, Bates 563)

The wiretap application only identifies two areas where the affiant conducted a traditional type of investigation of Carlos Rivera prior to seeking a wiretap on Target Telephone #9. The first was to conduct one day of surveillance of Rivera on July 3, 2009. (App. 68-71; Bates 608-611) The focus of the surveillance was David Navarro, whose telephone, Target Telephone # 5, was then being wiretapped. Police officers located Navarro through a GPS location request made on his phone. The police observed Navarro meet Rivera on Vinyard Avenue. Rivera entered Navarro's car and they drove to a house on Maitland Street. They then drove to Ralston Street. Next they drove to the Econo Inn. Navarro was overheard receiving directions over the telephone to meet someone. Later, the officers observe Navarro and Rivera driving away. The police take surveillance photos of Navarro and Rivera. From these photos, the police are able to identify Rivera from photos obtained in Parole Leads, a computer system used to access parolee records. (App. 68-71; Bates 608-611)

The second traditional type of investigation was to examine three weeks of the telephone records of Target Telephone #9. The records showed that between June 15, 2009 and July 6, 2009, Target Telephone #9 made 17 calls to two telephone numbers belonging to two people who were involved with Navarro's extortion activity. (App. 60-61; Bates No. 600-601)

The wiretap affidavit does not indicate that police officers ever targeted Carlos Rivera for surveillance or ever

conducted surveillance at his place of residence.  The affidavit rejects the use of search warrants and parole searches, stating that they would not achieve the goals of the investigation and their use would be premature if the searches were conducted prior to the wiretap. (Aff. p. 77-80; Bates No. 617-620) However, the affiant never considered the fact that Carlos Rivera was on parole and never explained why a parole search of Rivera and his residence would not be an appropriate traditional investigation that might further this investigation.  Other types of investigation are merely raised and rejected as not being likely to succeed.  They included the use of informants, use of subpoenas, use of undercover agents, use of mail covers, pole cameras, tacking devices, and grants of immunity.  None where ever tried in the case of Carlos Rivera.  (Aff. p. 74-85; Bates No. 614-625)

Carlos Rivera's  Arrest

On August 6, 2009, Carlos Rivera was arrested for possession of narcotics and violation of his parole.[2] (DEA Report p.1) Prior to his arrest, a wiretap application was granted on July 17, 2009 pursuant to a Drug Enforcement Administration ("DEA") investigation of the Black Angels gang and their connection with narcotic distribution, money laundering, and other offenses. (DEA Report p.1) Among the telephone lines listed to be monitored was a cell phone used by Rivera that was registered under Medina.

During several intercepted phone calls of TT#9, law

_____

[2] A copy of the D.E.A. Report is lodged with this motion as Exhibit B. All references to the report will be referenced by "DEA Report".

enforcement listened in on a conversation between Rivera and Roberto LNU in which Rivera asked Roberto LNU that if he wanted him to get "something" out for him, he was available. In response, Roberto LNU said he was going to give Rivera a "michelada". (DEA Report p.2) However, despite the literal translation of the word "michelada", Officer Justin Johnson opined that based on his training and experience, Rivera and Roberto LNU were actually negotiating for a half a pound of methamphetamine. (DEA Report p.2)

At approximately 8:31 p.m., wiretap surveillance intercepted a phone call on TT#9 between Rivera and Robert LNU in which Roberto LNU informed Rivera that he was heading over there. (DEA Report p.6) Approximately 20 minutes later, at 8:51 p.m., surveillance units took position at Rivera's residence at 815 N. Vineyard Ave., Apt. B and observed Inez Meza ("Meza") arrive in a gray Lincoln vehicle and meet with Rivera outside of Rivera's apartment. (DEA Report p.6) After speaking briefly, Meza returned to his car and retrieved a black plastic box with a strap and carried it inside to Rivera's apartment. Seven minutes after Meza arrived, Rivera received a phone call from Roberto LNU on TT#9 in Rivera confirmed receipt of the item. (DEA Report p.7)

At 9:13 p.m., police units observed Rivera exit the apartment and walk to a red Acura registered to Ignacio Espinoza ("Espinoza"). Upon entering the car on the driver's side, another male, identified as Peter Alvarez ("Alvarez") exited the apartment and entered the passenger side. Both men stayed inside the car briefly and then exited the vehicle and returned to Rivera's apartment. (DEA Report p.7)

At 11:07 p.m., law enforcement officials executed a

parole compliance check at Rivera's residence. Inside, they discovered four individuals: Bobby Reyes, Peter Alvarez, Carlos Rivera, and Jessica Medina. On Rivera's person, law enforcement agents discovered $3,385.00 in U.S. currency. (DEA Report p.9) At the same time, another officer conducted a search of the red Acura that Rivera was observed entering. Inside, officers located a car battery with a hidden compartment which contained eight ounces of a substance believed to be narcotics. (DEA Report p.9) As a result, Rivera was arrested for drug possession and violation of his parole under California Health and Safety Code §11378(a) and Pen. Code §3056.

Jessica Medina's Intercepted Calls

During the parole compliance check, Officer Laurence Bomomo interviewed Jessica Medina concerning the red Acura. Medina stated that the Acura belonged to Espinoza, that she and Espinoza are the only drivers of the vehicle, and that the vehicle had been located in front of her residence for the last six months. (DEA Report p.9) The police did not arrest Medina along with Rivera, and instead left Rivera's telephone (TT#9) with Medina to record any possible conversations that Medina would have following the arrest of Carlos Rivera. The prosecution now seeks to use, and the defendant seeks to suppress the following telephone conversations that Medina engaged in after Rivera's arrest:

On August 7, 2009, the wiretap recorded an outgoing call to Jorge LNU in which Medina discussed the strange circumstances surrounding the arrest of Rivera. (DEA Report p.10) Medina stated that it seemed strange that the police insisted on searching the

vehicle even after Rivera told the police that the car was not in his name. (DEA Report p.10)  Jorge LNU also asked if Rivera "owed that fool he was working with", to which Medina responded "yes" and that the police took all of Rivera's money. (DEA Report p.10) Medina went on to state that when the police asked Rivera why he had the money, Rivera told the police that he and Bobby were looking for a car and that Bobby loaned that money to Rivera. (DEA Report p.10)

Medina said that there was nothing at the house until the police arrived, and that all of the events that happened the night before took place within a 30 minute time span. (DEA Report p.10) Medina also went on to state that Rivera indicated that the informant was possibly Roberto LNU, because the police knew where to look and that Rivera hadn't heard from Robert LNU for quite some time until the day he was arrested. (DEA Report p.10)

Later that day, Medina received a phone call on TT#9 from an individual identified as Roberto LNU.  During the intercepted conversation, Medina stated that Rivera instructed her to ask Roberto LNU and Patrick for money that was owed to Rivera.  She stated that "whenever he was ready with that to let her know". (DEA Report p.12)  Medina also informed Roberto LNU that Rivera told her to say that "it was still going to be cracking". (DEA Report p.12) Medina also told Roberto LNU to let Patrick know about the money he owed and to call her. (DEA Report p.13)

That same day Medina called Ignacio Espinoza on TT#9, who was the registered owner of the red Acura where the narcotics were discovered.  During the conversation, Medina informed Espinoza that Rivera told law enforcement that the car had been stolen many times

11

and said that Rivera didn't know what Espinoza was going to say but that Espinoza should say that he didn't touch that car for two years. (DEA Report p.14; Recorded Call #2993 - 0:55 to 1:25) Espinoza said he was going to tell police, if asked, that it was Medina's car because he could not say he just left the car there. (DEA Report p.14)   Medina   informed   Espinoza   that if asked, Espinoza should state that he sold the car to Medina and Rivera, but that there was still money owed on the car, so the car was "just there". (DEA Report p.15)

In another phone call with an individual named Gabby, Medina stated that she told the police she did not know where the keys to the car were, reasoning that the police wanted to link the car with Rivera. (DEA Report p.15)   However, Medina admitted in another telephone call with David Hernandez that the keys were on her person at the time of Rivera's arrest. (DEA Report p.19) Medina also received a phone call on TT#9 from Patrick LNU.  During the conversation, Medina told Patrick that Rivera wanted Patrick to give her the money and that Rivera "would still be doing his thing". (DEA Report p.16)

As a result of her conversation with Patrick LNU, Medina contacted Venegas, the alleged drug associate of Rivera.   During several   telephone   calls,   Medina   discussed   with   Venegas   the financial issues of Patrick LNU and Roberto LNU.  She discussed with Venegas how both Patrick and Roberto were going to get into contact with Venegas and pay him the amount that was owed to Rivera. (DEA Report p.17-18)  When asked by Venegas how he should respond when Roberto LNU asked for more of "it", Medina asked "not to leave it on her."  She advised Venegas not to take actions that

1    could result in getting Venegas into trouble.  When Venegas said
2    that he could not make the decision, Medina stated to "do 1 instead
3    of 2".  (DEA Report p.19)

5                              **ARGUMENT**

7    I.    THE COURT SHOULD SUPPRESS THE WIRETAP EVIDENCE BECAUSE
8          THE WIRETAP APPLICATION FAILED TO SATISFY THE NECESSITY
9          REQUIREMENT OF TITLE III FOR TARGET TELEPHONE NUMBER #9

11         In 1968, Congress enacted Title III of the Omnibus Crime
12   Control and Safe Streets Act of 1968, which for the first time
13   authorized the government's's use of wiretaps under certain limited
14   conditions.  18 U.S.C. §§2510-2520.  Title III prohibits electronic
15   surveillance by the federal government except under carefully
16   defined circumstances.  United States v. Blackmon, 273 F.3d 1204,
17   1207 (9th Cir. 2001).  Wiretap evidence obtained unlawfully or in
18   violation of Title III must be suppressed.  United States v.
19   Giordano, 416 U.S. 505, 527 (1974).

20         A court may issue an order for interception of wire or
21   oral communications only if it finds probable cause.  This requires
22   a showing that a person is committing one of the innumerate crimes
23   in Title III, that communications concerning the crime will be
24   obtained through interception, and that a specific telephone which
25   is the target of the intercept will be used in connection with the
26   commission of the crime. 18 U.S.C. §2518 (3).  The probable cause
27   standard  for a wiretap is the same standard that is used to
28   obtained search warrants.  United States v. Carneiro, 861 F.2d

                                  13

1171, 1179 (9th Cir.1988).

The United States Supreme Court has held that a defendant may go beyond the facial sufficiency of an affidavit supporting a warrant and challenge the truthfulness of the factual statements. Franks v. Delaware, 438 U.S. 154 (1978).  Once a defendant has made a showing that the affidavit contains false statements and that the statements were deliberately false or a result of reckless disregard for the truth, then the statements are removed from the applications and the warrant is retested for probable cause. United States v. Ippolito, 774 F.2d 1482 (9th Cir. 1985).  If the false statements in the wiretap affidavit could have misled the issuing judge and if the false statements had been revealed, so that a reasonable court judge could have denied the wiretap request, the intercepted conversation must be ordered suppressed. United States v. Blackmon, 237 F.2d 1204, 1208 (9th Cir. 2001); United States v. Carneiro, 861 F.2d 1171, 1180 (9th Cir. 1988).

In addition to establishing probable cause, a wiretap affidavit must also meet a "necessity requirement."  Pursuant to 18 U.S.C. §2518 (1)(c), the wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appeared to be unlikely to succeed if tried or to be too dangerous."  United States v. Blackmon, 273 F.3d 1204, 1207 (9th Cir. 2001); United States v. Ippolito, supra, 774 F.2d at 1486; United States v. Brown, 761 F.2d 1272, 1275-76 (9th Cir.1985).

The necessity requirement "exists in order to limit the use of wiretaps, which are highly intrusive."  United States v. Bennett, 219 F.3d 1117, 1121(9th Cir. 2000).  The statute also

requires that the issuing judge determine whether the wiretap application contains facts supporting a finding that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C.  §2518 (3)(c).  The purpose of these requirements is to insure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.  United States v. Kahn, 415 U.S. 143, 153 n.12 (1974).

Here, the defendant is entitled to suppression of the evidence obtained through the wiretap of Rivera because the government failed to establish necessity for the wiretapping of TT#9.  Necessity requires a good faith effort on the part of law enforcement officers to conduct a traditional criminal investigation prior to applying for a wiretap.

In this case, the law enforcement officers only did two things to fulfill the necessity requirement in the application to wiretap Target Telephone # 9.  First, the officers conducted one day of surveillance of Carlos Rivera.  Second, the officers examined the telephone toll records of Rivera's calls for a three week period prior to applying for the wiretap.  This was insufficient effort to constitute a good faith traditional investigation.  As a matter of law, the wiretap application failed to satisfy the necessity requirement.  The Court should therefore suppress the wiretap evidence.  United States v. Gonzalez, Inc., 412 F.3d 1102 (9th Cir. 2005); United States v. Blackmon, 273 F.3d 1204 (9th Cir. 2001); United States v. Carneiro, 861 F.2d 1171 (9th Cir. 1988); United States v. Ippolito, 774 F.2d 1482 (9th Cir.

1985).

In <u>Carneiro</u>, the government conducted a substantial investigation into a cocaine and marijuana trafficking ring. 861 F.2d at 1171. After spending several months investigating four particular suspects, the government sought to wiretap the telephones of two of the suspects, McNeil and Harty. Through the interception of calls on these first wiretaps, the government learned that Thomas Boyd was Harty's supplier. The government then sought and obtained a wiretap of Boyd's telephone. Based on the interception of calls on this second wiretap, the government obtained evidence to prosecute Boyd. Boyd sought to suppress the information obtained through the wiretap on the ground that the government had failed to show necessity, but the district court denied the motion.

On appeal, the Ninth Circuit held that the information obtained through the Boyd wiretap should have been suppressed. The Court stated that the previous investigation of McNeil and Harty was not sufficient to show that the government had tried to use traditional investigative techniques against Boyd before it sought the wiretap. The Ninth Circuit held that even when the government is investigating a conspiracy "there must be a showing of necessity with respect to each telephone and conspirator." Id. at 1182. The government must investigate each conspirator before seeking to wiretap that individual's telephone. The government cannot piggy-back a subsequent wiretap on the necessity established for a previous wiretap. Id. at 1181-83.

A similar result was reached in <u>Gonzalez, Inc.</u>, where the government was conducting a substantial, multi-year

16

investigation into a conspiracy to smuggle aliens into the United States using GST, a public bus company. 412 F.3d at 1102. During the initial investigation, the government used pole cameras, physical surveillance, undercover agents, and other traditional methods to gather evidence at the Phoenix and Tucson bus terminals of GST. After substantial use of these techniques, the government sought a wiretap of the telephones of the Phoenix and Tucson bus terminals, which was granted. Through these wiretaps, the government intercepted a call from the founder of GST in the Los Angeles head office.

Based on this call, the government conducted a brief investigation of the Los Angeles office. It collected five days of pen registers on the office's telephones and five days of trap-and-trace analyses of the telephones. The government also conducted limited physical surveillance of the office and made a preliminary inquiry into the possibility of placing an undercover agent there. After this limited investigation, the government sought a wiretap of the Los Angeles office's telephones, which was granted.

On appeal, the Ninth Circuit held that the wiretap affidavit failed to show that law enforcement had adequately pursued traditional investigative methods before seeking the second wiretap on the Los Angeles office. The investigators, after learning that the Los Angeles office might be involved in the conspiracy, did not conduct an adequate, individual investigation of the Los Angeles office, but instead sought a wiretap based on the past failure of investigative methods at the Phoenix and Tucson bus terminals. The Ninth Circuit held that the attempt to

1   piggy-back the Los Angeles office wiretap on the substantial

2   investigation of the Phoenix and Tucson terminals was insufficient

3   to show necessity.

4          Under Carneiro and Gonzalez, Inc., the necessity required

5   for the wiretap of Carlos Rivera's telephone, Target Telephone # 9,

6   cannot be supplied by the prior investigation of other persons in

7   the conspiracy. Necessity must be shown by the fact that

8   traditional investigative techniques had been tried unsuccessfully

9   against Carlos Rivera. The wiretap application on Target Telephone

10  # 9 did not make this showing and thus, the necessity requirement

11  was not established for TT #9, requiring the evidence to be

12  suppressed.

13         There is also a false statement in the wiretap application

14  for Target Telephone # 9 requiring suppression under Franks v

15  Delaware, 438 U.S. 154 (1978).  If a defendant challenges the

16  affidavit used to secure a Title III wiretap, the defendant is

17  entitled to an evidentiary hearing if he "makes a substantial

18  preliminary showing that a false statement knowingly and

19  intentionally, or with reckless disregard for the truth, was

20  included by the affiant in the [wiretap] affidavit, and if the

21  allegedly false statement is necessary to the finding of probable

22  cause" or necessity. Franks v Delaware, supra, 438 U.S. at 155-56

23  (probable cause); United States v Ippolito, supra, 774 F.2d at 1485

24  (necessity).  If, "at [the] hearing the allegation of . . .

25  reckless disregard is established by the defendant . . . and, with

26  the affidavit's false material set to one side" and the false

27  omissions included, "the affidavit's remaining content is

28  insufficient to establish probable cause" or necessity, the wiretap

18

"must be voided and the fruits of the search excluded to the same extent as if probable cause" or necessity "was lacking on the face of the affidavit." <u>Franks v Delaware</u>, supra, 438 U.S. at 157; <u>United States v Ippolito</u>, supra, 774 F.2d at 1485.

The affiant for Target Telephone # 9 made a false representation concerning necessity. When discussing the possibility of conducting trash searches, a traditional method of criminal investigations, the affiant stated that he could not conduct such a trash search on the home of the user of TT #9, because the residence of the user of TT #9 was unknown. This was a false statement. The officers had the residence address of Carlos Rivera and could have conducted a trash search of his residence.

By falsely stating that Rivera's place of residence was unknown, the affiant improperly and deceptively suggested that a wiretap was necessary to determine where he lived as well as a possible location where drugs and other evidence of the target crimes could be found. (App. p.82, Bates 622). However, later in the same wiretap application dated July 17, 2009, the government identifies Rivera's address and place of residence as 815 North Vineyard Ave., Apartment B; the same address where he was later arrested. (App. p.23, Bates 563).

The false statement concerning Rivera's address is indicative of the government's "cut and paste" of boilerplate language into subsequent wiretap applications. In other words, rather than conducting a new traditional investigation of a new suspect on a subsequent wiretap investigation, the government merely uses the same language from an earlier wiretap application

1  on the telephone of an earlier suspect.  Rather than conducting a
2  new traditional investigation on a new suspect, the government
3  relies on mere conclusory statements that necessity existed and
4  that normal investigative procedures would have failed or have been
5  unreasonably dangerous.

6        In United States v. Kalustian, 529 F.2d 585 (9th Cir.
7  1976), the Ninth Circuit held that mere conclusory statements that
8  normal investigative procedures have failed in the past and are
9  likely to fail in the future were insufficient compliance with the
10 statutory requirement.  The Court further held that a violation of
11 18 U.S.C. §2518 (3)(c) requires suppression of the wiretap
12 evidence.  In suppressing the evidence, the Court in Kalustian
13 noted that the government's application "did not adequately show
14 why traditional investigative techniques were not sufficient in
15 this particular case." United States v. Kalustian, supra, 529 F.2d
16 at 590.

17       In United States v Blackmon, 273 F.3d 1204 (9th Cir. 2001)
18 the government conducted a substantial narcotics investigation
19 which included numerous suspects.  After six months of traditional
20 investigatory techniques, the government requested a wiretap of
21 Maurice Miller, a suspected narcotics trafficker.  The wiretap
22 produced evidence that resulted in charges against Miller and
23 others. Three later wiretaps were also obtained through information
24 gathered in the Miller wiretap. These wiretaps involved telephones
25 used by Rodney Blackmon. The Blackmon wiretaps produced substantial
26 evidence of Blackmon's criminal activity. Blackmon sought to
27 suppress the wiretap evidence, alleging that the government failed
28 to show necessity. The district court declined to suppress the

evidence and Blackmon appealed.

The Ninth Circuit held that the wiretap evidence against Blackmon should have been suppressed for two reasons: (1) the application, which was nearly a carbon copy of a previous application for a different suspect, contained material misstatements and omissions regarding the necessity for the wiretap, and (2) once purged of all the material misstatements and omissions as required by Ippolito, the application contained only generalized statements that would be true of any narcotics investigation. United States v Blackmon, supra, 273 F.3d at 1208.

In particular, the Ninth Circuit took issue with the affidavit's "generalized investigative purpose," which was as follows: "While [traditional] techniques are useful in establishing various aspects of the criminal enterprise, they have not been, and are not likely to be sufficient to produce the evidence necessary to identify all the participants in this cocaine trafficking organization and to result in the successful prosecution of these individuals for their full involvement in this criminal enterprise." United States v Blackmon, supra, 273 F.3d at 1210.

Based on this broad investigative purpose, the government stated in the affidavit that various traditional methods had failed or would fail. The government stated that confidential informants would be insufficient because they "typically only possess limited knowledge concerning the scope of the criminal enterprise." United States v Blackmon, supra, at 1210. It stated that pen registers would not be adequate because those "records only provide evidence that the telephone was used, without showing the identity of the callers or the nature or purpose of those communications." United

1   <u>States v Blackmon</u>, supra, at 1210.

2         The government contended that search warrants and witnesses
3   would be ineffective because they "would be unlikely to produce
4   evidence which would identify fully the other members of the
5   organization, the organizational structure, the scope of the
6   narcotics trafficking conspiracy, or the sources of supply" and
7   because "interviews of witnesses [would] not be successful in
8   developing sufficient evidence to prosecute this entire
9   organization." <u>United States v Blackmon</u>, supra, at 1210.

10        The Ninth Circuit found that these statements "would be
11  true of most or all drug conspiracy investigations," merely
12  described "the inherent limitations" of certain techniques, and
13  were "unsupported by specific facts relevant to the particular
14  circumstances of this case." <u>United States v Blackmon</u>, supra, at
15  1210.  The Ninth Circuit concluded by stating that " Wiretaps
16  themselves could little achieve the investigative goals stated in
17  the government's application. The government may not cast its
18  investigative net so far and so wide as to manufacture necessity in
19  all circumstances." <u>United States v Blackmon</u>, supra, 273 F.3d at
20  1211.

21        Much of what was stated in <u>Blackmon</u> applies to the
22  defendant's case.  To support the Drug Enforcement Administration's
23  showing that a wiretap was necessary, the prosecution attempts to
24  establish that physical surveillance of Rivera is impractical and
25  would unreasonably endanger their investigation.  However, despite
26  this conclusory statement, law enforcement officials successfully
27  and covertly identified and followed Rivera as he made contact with
28  several as of yet unidentified subjects at various locations. (App.

22

1   pgs.68-71, Bates 608-611)  Despite having this information, there
2   were no reports or statements suggesting that law enforcement
3   officials took any investigative measures beyond recording their
4   observations.  There is no evidence that law enforcement officials
5   took reasonable investigative steps to identify the individuals
6   that Rivera met with, or conducted surveillance at Rivera's
7   residence.

8       The government's mere conclusory statement that normal
9   investigative procedures would not work should result in the
10  wiretap evidence being suppressed.  There is evidence to suggest
11  that normal investigative procedures would have produced admissible
12  evidence in furtherance of their investigation had any reasonable
13  steps been taken to pursue such an investigation.  As noted in the
14  Blackmon case, boilerplate assertions that "are unsupported by
15  specific facts relevant to the particular circumstances of the
16  case" are not sufficient to establish the necessity requirement.
17  United States v Blackmon, supra, at 1210.  Therefore, the court
18  should suppress the wiretap evidence it this case. The necessity
19  requirement was not met.

20

21  II.  THE GOVERNMENT'S EVIDENCE DERIVED FROM THE WIRETAP OF
22       TARGET TELEPHONE #9 MUST BE SUPPRESSED BECAUSE PROBABLE
23       CAUSE AND NECESSITY CEASED TO EXIST AFTER RIVERA'S ARREST

24

25       On July 17, 2009, a wiretap order was signed authorizing
26  the wiretapping of Target Telephone # 9, a phone registered to
27  Jessica Medina, but used primarily by Carlos Rivera.  From July 17,
28  2009 through August 6, 2009, law enforcement officers listening

23

1   over the wiretap overheard Carlos Rivera engaging in telephone
2   conversations with other suspects involving the distribution of
3   methamphetamine.   Jessica Medina did not use Target Telephone at
4   all during this period.

5          On August 6, 2012, after listening to Carlos Rivera
6   conduct a methamphetamine transaction over the telephone, officers
7   conducted a parole search at the residence of Carlos Rivera and
8   Jessica Medina.  A half a pound of methamphetamine was found during
9   a search of Rivera's car which was parked in front of the
10  residence.  Rivera was arrested.  At the time of the arrest, the
11  police seized the methamphetamine from the care and money taken
12  from Rivera's person.

13         Rivera's telephone, Target Telephone # 9, was left at the
14  residence with Jessica Medina.   Thereafter, pursuant to the
15  wiretap, the officers continued to monitor the wiretap of Target
16  Telephone # 9.   Over the next few days, Jessica Medina's
17  conversations over Target Telephone # 9 were intercepted and the
18  government intends to offer those conversations at trial as
19  evidence of her participation in the conspiracy charged in this
20  case.  Ms. Medina moves to suppress these conversations as being
21  obtained in violation of Title III.

22         The interception of wire or oral communications is proper
23  only if there is both probable cause and necessity.  United States
24  v. Carneiro, 861 F.2d 1171, 1179 (9th Cir. 1988).   The probable
25  cause and necessity requirements for wiretaps is based on the
26  Court's recognition that there are fewer threats to liberty greater
27  than the ones posed through the use of wiretaps.  Berger v. New
28  York, 388 U.S. 41, 63 (1967).  As a result, when wiretap evidence

is obtained unlawfully or in violation of Title III, the resulting evidence must be suppressed.  United States v. Giordano, 416 U.S. 505, 527 (1974).

In the instant case, the recording of Medina's conversations over TT #9 were the equivalent of a new and separate wiretap. Like a traditional search warrant affidavit, a wiretap application must establish that the target has committed or is committing a crime. (See 18 U.S.C. §2518(3)(a)).  For the wiretapping of Ms. Medina to be lawful, the government must have established in the wiretap application that there was probable cause to believe that Medina was involved in the conspiracy, as well as establishing necessity by showing that normal investigative procedures have been tried and failed, or would be unlikely to succeed if tired, or would be too dangerous.  There is no evidence of those factual showings in the wiretap application.

In United States v. Brone, 792 F.2d 1504 (9th Cir. 1986) the Ninth Circuit Court held that the government is required to demonstrate necessity in each instance where they desire to expand the wiretap authorization to cover new crimes or new alleged coconspirators.  In Brone, supra, the Court held that "[t]he government may not dispense with the statutorily mandated showing of necessity to obtain a wiretap of [a] telephone, despite the validity of the wiretap of [a] coconspirators' telephone." United States v. Brone, supra, 792 F.2d at 1507.

Here, the government seeks to introduce evidence that Medina was an active member of the alleged conspiracy when she spoke to other members of the Black Angels gang.  The government contends that Medina continued Rivera's alleged narcotics

trafficking while he was in custody by attempting to coordinate a story in an attempt to cover-up the drugs found in Espinoza's car as well as schedule payments owed to Rivera.

However, all of the recorded calls were made after the targeted individual, Carlos Rivera, was taken into custody. Assuming, arguendo, that the probable cause and necessity requirements were sufficiently met to intercept the phone conversations of Rivera, any existing probable cause and necessity that existed was extinguished after Rivera's arrest.  The probable cause showing for the wiretap on Target Telephone # 9 was based upon the criminal activity of Carlos Rivera, not Jessica Medina. Up until the time of his arrest, Rivera was the only person using TT #9.  By giving Target Telephone to Jessica Medina and continuing electronic surveillance on that phone after Carlos Rivera was inc custody, the government was essentially creating a new, de facto wiretap authorization against Jessica Medina or an impermissible wiretap extension proscribed by Brone.

In United States v Reed, 575 F.3d 900 (9th Cir. 2009) investigating officers had probable cause to believe Reed was involved in a drug manufacturing conspiracy.  They applied for and obtained a wiretap on a telephone they believed to be used by Reed. However, within hours of monitoring the telephone, the officers learned that another man, Jackson, was the primary user of the phone.  Rather than discontinuing the wiretapping, the officers continued to monitor and record Jackson's conversations.  The Ninth Circuit held that the continued monitoring was proper because authorization for a wiretap is based on probable cause to believe that a telephone is being used to facilitate the commission of a

1  crime and the order need not name any particular person if such

2  person is unknown.  United States v Reed, supra, 575 F.3d 910.

3       The Reed case is distinguishable from Medina's case.  In

4  Medina's case, the purpose of the wiretap was to intercept the

5  telephone conversations of Carlos Rivera over TT #9.  There was

6  probable cause that he was engaged in drug trafficking based upon

7  the investigation leading up to the wiretap application.  Indeed,

8  once the officer began monitoring TT #9, they overheard Carlos

9  Rivera engaging in conversations related to the distribution of

10 drugs.  Once the officers arrested Carlos Rivera on August 6, 2009

11 and took the phone away from Rivera, there was no reason to believe

12 that further wiretapping of TT #9 would result in the capturing of

13 Rivera's criminal conversations.

14      By delivering the telephone to the defendant Jessica

15 Medina, the officers were using he wiretap order in order to

16 monitor the private conversations of Jessica Medina, a person for

17 whom they had no probable cause to believe was committing criminal

18 acts.  For the officers to monitor the calls of Jessica Medina,

19 they were required to obtain a new wiretap order authorizing the

20 interception of her calls.  In this case, the officers did not do

21 that because there was no probable cause on August 6, 2009 to

22 believe that Medina was involved in the conspiracy or would use the

23 telephone in order to commit criminal acts.

24      Here, it is clear that the government was not aware of

25 facts establishing probable cause to believe Medina was involved in

26 criminal activity at the time of the original application for a

27 wiretap on TT #9.  Unlike Rivera, Medina was not mentioned in any

28 of the previous wiretap applications, surveillance notes, or

reports of investigation prior to July 17, 2009, the date the wiretap application was submitted. Even in that specific application, her name was mentioned only as the subscriber to TT#9 that Rivera used. The government did not provide any evidence, make any allegations, or furnish any facts to suggest that anyone other that Rivera used TT#9 or that criminal conversations would take place on TT#9 after his arrest. Therefore, the government did not have sufficient probable cause in the wiretap application to justify the continued wiretapping of the calls on TT #9 after Carlos Rivera was arrested and was placed in custody.

The government may argue that the continued monitoring of TT#9 was proper even after Rivera's arrest because they suspected that as Rivera's girlfriend, Jessica Medina, was also a part of the alleged conspiracy. However, "[a] suspicion that a person is a member of a conspiracy... is not a sufficient reason to obtain a wiretap." <u>United States v. Carneiro</u>, supra, 861 F.2d at 1181. Here, the government failed to show in the wiretap application that Medina was even suspected as engaging in targeted criminal behavior. Rather, Medina's only connection to the alleged criminal activity was the fact that she was the subscriber to the telephone, TT#9, that her boyfriend, Carlos Rivera used. As a result, probable cause and necessity was not established to any degree in regards to the interception of Medina's private conversations over Target Telephone # 9 after Rivera's arrest. Those conversations should be suppressed.

III. <u>DEFENDANT JESSICA MEDINA HAS STANDING TO SUPPRESS THE WIRETAP AND ALL DERIVATIVE EVIDENCE</u>

28

1

2          Title III permits a person to move to suppress
3   intercepted conversations or derivative evidence if he is an
4   "aggrieved person" as defined by statute.  "Any aggrieved person in
5   any trial... may move to suppress the contents of any wire or oral
6   communication intercepted pursuant to this chapter, or evidence
7   derived therefrom..." 18 U.S.C. § 2518 (10)(a).  An "aggrieved
8   person" is defined as "a person who was a party to any intercepted
9   wire, oral, or electronic communication, or a person against whom
10  the interception was directed." 18 U.S.C. § 2510 (11).  The United
11  States Supreme court addressed the question of who had standing to
12  contest the use of evidence derived from allegedly illegal
13  wiretapping in Alderman v. United States, 394 U.S. 165 (1969).  In
14  the Alderman case, the Court held that a defendant had standing to
15  contest the use of evidence derived from eavesdropping only if the
16  defendant was a party to an intercepted conversation or "if the
17  defendant himself was not intercepted" he owned the premises upon
18  which the interception had occurred.  Alderman v. United States,
19  supra, 394 U.S. at 176-178.

20          In this case, defendant Jessica Medina was a party to
21  conversations intercepted over TT #9.  The telephone was also
22  registered in her name.  Therefore, she has standing to move to
23  suppress the results of the wiretapping of that telephone and all
24  evidence derived from the wiretapping.

25

26      IV.    DEFENDANT JESSICA MEDINA JOINS IN THE MOTIONS TO
27             SUPPRESS THE WIRETAP FILED BY THE CO-DEFENDANT

28

1   The defendant Jessica Medina joins in the motions to suppress

2   the wiretap evidence filed by the co-defendant Juan Gil to the

3   extent that they may enure to the benefit of the defendant Medina

4   and to the extent that she has standing based upon her declaration

5   of standing filed herein.  Those motions are the motion to suppress

6   based on the unlawful delegation of warrant execution to non-law

7   enforcement, untrained, unsupervised civilians fro hire (DOC 1556);

8   motion to suppress based on the wiretaps not being properly

9   authorized by the Department of Justice (DOC 1557); and the motion

10  to suppress based on the overbroad orders that failed to identify

11  particular evidence  to be seized (DOC 1558).

12

13

14                            **CONCLUSION**

15

16      Based upon the foregoing, the defendant moves to suppress

17  all of the wiretap evidence and all of the evidence derived from

18  the wiretap.

19

20  Dated: July 13 , 2011              Respectfully Submitted,

21

22                              /s/ Joseph F. Walsh
                                JOSEPH F. WALSH
23                              Attorney for Defendant
                                JESSICA MEDINA

24

25

26

27

28

30

**DECLARATION OF JESSICA MEDINA**

I, Jessica Medina hereby declare:

1. I am a defendant in the above case.

2. I make this declaration under the authority of Simmons v United States, 390 U.S. 377 (1968) with the understanding that my statements in this declaration may not be used against me or admitted into evidence in the prosecution's case in chief at a trial and I expressly reserve my Fifth Amendment Rights.

3. I have reviewed the recordings provided by the government for the calls intercepted over Target Telephone #9, (909) 914-9937, pursuant to a court authorized wiretap.  I was a party to the recorded conversations and my conversations were intercepted by the wiretap.  I had a reasonable expectation of privacy while using Target Telephone #9 at the time that my conversations were intercepted.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 13, 2012, at Ontario, California.


                                        /s/ Jessica Medina

                                        _____

                                         JESSICA MEDINA